<u>AFFIDAVIT FOR CRIMINAL COMPLAINT</u>

I, Robert Jacobsen, Special Agent, Bureau of Alcohol, Tobacco, Firearms & Explosives, being duly sworn, state as follows:

**INTRODUCTION**

1. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and have been so employed since November, 2017. I received 15 weeks of Criminal Investigator training at the Federal Law Enforcement Training Center and 17 weeks of ATF Special Agent training at the ATF National Academy. I was trained in Federal criminal law, firearms, and criminal investigation techniques.

2. Since joining ATF, I have investigated acts violent crime and federal firearms violations which has included participating in the controlled purchases of firearms, interviews of suspects, participating in search warrants, electronic surveillance, and analyzing firearms trace data. I have investigated criminal gang organizations and the violent crime associated with those gangs.

3. Prior to my employment with the ATF, I was employed for approximately two-and-a-half years as a Deputy Sheriff with the Loudoun County Sheriff's Office in Loudoun County, Virginia. For approximately the last year of that employment, I operated as a member of the Special Operations Unit, a full-time SWAT team and Street Crimes Criminal Suppression Unit. I was trained and certified by the Columbus Police Department as a SWAT operator and hold numerous training certificates in domestic and foreign weapon systems, street crimes, criminal narcotic operations, and gang organizations. Prior to joining the Special Operations Unit, I spent approximately one-and-a-half years in a Patrol function, responding to public emergency calls for service, investigating crimes, and testifying in court. I graduated from the Northern Virginia

1

4. Criminal Justice Academy with Virginia state certifications as a Police Officer and Jail Corrections Officer. I received a Bachelor's of Science Degree from George Mason University.

5. I respectfully submit this Affidavit in support of a Criminal Complaint charging **KEITH COUSIN**, and **RICO PERRY** for violations of: Title 18, United States Code, Section 1951, which prohibits the actual, attempted, or conspiracy to commit robbery or extortion affecting interstate or foreign commerce; and Title 21, United States Code, Sections 846 and 841(a)(1), (b)(1)(A), conspiracy to distribute and to possess with the intent to distribute five (5) kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II narcotic controlled substance.

6. I am familiar with the facts and circumstances of this investigation based upon: (a) my personal knowledge and involvement in the investigation; (b) my discussions with fellow agents and state/local law enforcement personnel who assisted in the investigation; (c) interviews of witnesses; (d) my review of reports; and (e) my experience and training as a criminal investigator. Because this affidavit is being submitted for the limited purpose of establishing probable cause for the requested criminal complaint, I have not set forth every fact learned during the course of the investigation.

**BACKGROUND**

7. In October of 2019, ATF Confidential Informant #27698, who is a cooperating witness (CW), provided me with information regarding Keith **COUSIN**.1 The CW advised that **COUSIN** is a

---

1 The CW has a criminal history that includes prior firearm and drug distribution convictions. On previous occasions, the CW has accurately identified and corroborated events and individuals involved in active criminal investigations. At the direction of law enforcement, the CW has conducted controlled purchases of evidence in conjunction with criminal investigations. The CW is being paid for her/his services and information provided.

2

member of the Columbia Road street gang who was recently released from jail, having been charged with Murder and found not guilty in a jury trial in May of 2019. The CW informed me that **COUSIN** was actively requesting that people locate drug dealers with stash-houses in possession of money and narcotics, and to report back to **COUSIN** with the information.

**PROBABLE CAUSE**

**Introduction of ATF Undercover Agent and Initial Meeting with Keith COUSIN**

8. On January 7, 2020, Special Agent (SA) Valles, acting in an undercover capacity, met with **COUSIN**. The purpose of this meeting was to ascertain **COUSIN's** interest in committing an armed robbery of a narcotics stash house. The CW was also present at this meeting as she/he was responsible for making the introduction between **COUSIN** and SA Valles.

9. In substance and among other things, the conversation included the following. SA Valles explained to **COUSIN** that he was a disgruntled cocaine courie, who works for a Mexican-based Drug Trafficking Organization (DTO)that was seeking to expand its operations to the New England area. SA Valles stated that the DTO maintained "stash" houses containing "quality cocaine." SA Valles then explained that he was responsible for transporting two (2) kilograms of cocaine for the DTO, to which **COUSIN** acknowledged that he understood by stating, "Oh, so you're the courier." SA Valles affirmatively acknowledged.

10. SA Valles then explained that every time, while collecting the cocaine at the stash houses, SA Valles observed at least ten (10) "kilos" of cocaine. SA Valles stated that every time he entered the stash house, there were always the same two guards at the residence, one of whom was always armed with a "pistol on his hip." **COUSIN** then stated, "Play it like they both got guns" and advised SA Valles to continue explaining. SA Valles then explained that when he entered the

3

stash house, one of the guards would retrieve two (2) kilos from a back room, hand them to SA Valles, and then provide SA Valles with the destination location.

11. SA Valles went on to explain that the DTO had not provided payment to the UC for the last two (2) occasions that SA Valles had transported the kilos of cocaine, and that was the reason SA Valles was looking for someone to rob the stash house. Additionally, SA Valles advised that this would be the first time he would be conducting a transport for the DTO in this area, and because the DTO was making him come all the way to the Boston area from El Paso, TX, it was yet another reason he was disgruntled. **COUSIN** affirmatively acknowledged.

12. **COUSIN** told SA Valles that he could have not picked someone better (than himself) to conduct the robbery. **COUSIN** further stated that he understood he was dealing with people whom "the cartel entrusted to watch they drugs" and that there would definitely have to be some type of "hostile takeover".

### Second Undercover Meeting with Keith COUSIN and Rico PERRY

13. On January 8, 2020, SA Valles and the CW met **COUSIN** and another individual at a Boston-based hotel. That person introduced himself to SA Valles as "E". I obtained still photographs of the individual accompanying **COUSIN** to the hotel. I provided photographs of that individual to Suffolk County Sheriff's Office Lieutenant and ATF Task Force Officer (TFO) Keith Medeiros. TFO Medeiros contacted employees of the Massachusetts Department of Corrections (DOC), who were able to positively identify the individual in the photographs as **RICO PERRY**. I located **PERRY's** photograph, as maintained by the Massachusetts Registry of Motor Vehicles (RMV), and showed it to SA Valles. SA Valles identified **PERRY** as the individual in the hotel room with him on January 8, 2020.

14. In substance and among other things, the conversation that took place in the hotel room included the following. **COUSIN** advised SA Valles that **PERRY** was his "peoples." SA Valles affirmatively acknowledged and then asked **PERRY** if **COUSIN** had advised him of "what was going on". **PERRY** replied that he only been "briefly" advised and that he was present to hear the details [relative to the armed robbery] from SA Valles. SA Valles then asked **PERRY** if he hit "licks", which in this context is a street vernacular term commonly used to refer to a home invasion style, armed robbery. **PERRY** replied by nodding in the affirmative and stating, "Yeah."

15. SA Valles then proceeded to explain that he was a disgruntled cocaine courier, who works for a Mexican based DTO that was seeking to expand its operations to the New England area. SA Valles explained that the DTO maintained stash houses containing "pure cocaine". SA Valles then stated that he was responsible for transporting two (2) "kilos" of cocaine for the DTO, to which **PERRY** affirmatively acknowledged by stating, "Okay". SA Valles added that every time, while collecting the cocaine at the stash houses, SA Valles observed at least ten (10) "kilos" of cocaine. SA Valles stated that every time he entered the stash house, there were always the same two guards at the residence, one of whom was always armed with a "pistol on his hip". SA Valles then explained that when he entered the stash house, one of the guards would retrieve two (2) kilos from a back room, hand them to SA Valles, and then provide SA Valles with the destination location. SA Valles asked **PERRY** if he understood what he had explained thus far, to which **PERRY** affirmatively acknowledged by stating, "Mm hmm."

16. SA Valles went on to explain that the DTO had not provided payment to the UC for the last two (2) occasions that the UC had transported the kilos of cocaine, and that was the reason SA Valles

was looking for someone to rob the stash house. Additionally, SA Valles advised that this would be the first time he would be conducting a transport for the DTO in this area, and because the DTO was making him come all the way to the [Boston] area, it was yet another reason he was disgruntled. **COUSIN** then stated to **PERRY** that this meeting was necessary because, "When it comes to life changing situations, it's that much more in the planning." He continued by stating, "If you ain't planning, you planning to fail." **PERRY** affirmatively acknowledged.

17. SA Valles then proceeded to explain that the DTO utilizes vacant, single family houses to stash the cocaine and that the DTO never utilizes the same location as a stash house. SA Valles also said that they never keep "cash" in the same stash houses used for the cocaine. **PERRY** affirmatively acknowledged that he understood by stating, "They ain't gonna do that… getting caught with both ain't gonna help no one."

18. **PERRY** and **COUSIN** then asked SA Valles the manner in which he was greeted by the armed guards when SA Valles arrived at the stash house. Specifically, **PERRY** asked if the guard who SA Valles knew for sure to be armed was the guard who answered the door. SA Valles then explained that the guard who was not visibly armed was the guard who always answered the door, while the visibly armed guard remained immediately behind him. SA Valles further explained that the same guard who answered the door was the same one who would shut the door behind SA Valles after he entered. **PERRY** then expressed concern that the visibly armed guard would not be able to be immediately addressed because he was behind the other guard and could very possibly be able to "get the gun" on **PERRY** and **COUSIN**. **COUSIN** agreed and suggested that more planning had to be done in the meantime (prior to the robbery being conducted). **COUSIN** stated that they (he and **PERRY**) knew that the target of the robbery was not going to be "crumbs" and SA Valles reiterated that the target of the robbery would be ten (10) [kilos of

6

cocaine]. SA Valles then discussed the split of the proceeds of the robbery with **COUSIN** and **PERRY** and suggested that the proceeds be divided "fifty-fifty". **COUSIN** agreed by stating, "Of course."

19. **PERRY** then revisited the manner in which SA Valles entered the stash house. SA Valles reiterated what he had previously explained and **COUSIN** and **PERRY** then began to discuss how they thought the robbery should be conducted. Specifically, **COUSIN** was of the opinion that they should rob SA Valles after he came out of the house. **COUSIN** explained that he would rather have a sure thing, that being the "two bricks" that SA Valles would be coming out of the house with, than have nothing at all. (In this context "brick" is a street vernacular term commonly used to refer to a kilo of cocaine.) **PERRY** was of the opinion that they would have to make entry into the house, regardless. **PERRY** then stated, "I'm going in there… I ain't playing." He added that upon entering the house, he immediately wanted to put a "gun" to the first guard's head, take him "hostage," and use him as a "shield" so that the guards could be subdued, so as not to "let off a shot". **COUSIN** agreed with the notion of the guards not being able to shoot and stated, "That's the key to any robbery on earth." **PERRY** ultimately stated to **COUSIN**, "If you don't get the situation under control, nothing's going right."

20. SA Valles then stated that he had one more detail to advise **COUSIN** and **PERRY** of. SA Valles stated that the kilos were "stamped" with either a little "horse" or a "spider". **PERRY** then interjected and asked, "Don't serve 'em pure?" SA Valles affirmatively acknowledged and stressed that he needed to know that **COUSIN** and **PERRY** would not attempt to sell an entire, stamped kilo of cocaine, prior to breaking it down, so as not to raise suspicion as to where the kilogram came from. Both **COUSIN** and **PERRY** acknowledged they understood SA Valles did

not want the stamp to be on the streets. **COUSIN** stated that he would not even be robbing someone of their "drugs" if he did not have the means to distribute it, and **PERRY** added that his portion of the cocaine was going "straight to the stove," which in this context is a street vernacular phrase commonly used to refer to converting powder cocaine into crack cocaine. **COUSIN** then asked SA Valles, "You can turn one into two anyway, right?" SA Valles affirmatively acknowledged, and as he began to talk about the situation when the kilo was broken open, **PERRY** interjected and asked if the all the "pink," "crystals" and "flake" could be seen inside of the kilo. SA Valles affirmatively acknowledged and added that the cocaine was "fish scale", which in this context, is a street vernacular term commonly used to refer to a very high-quality cocaine, usually right off the kilogram, that is uncut. Both **COUSIN** and **PERRY** laughed.

21. **COUSIN** then assured SA Valles that this type of job would require two (2) members with "machine guns" and a third member with a "handgun." SA Valles affirmatively acknowledged and advised **COUSIN** that he would stay in contact until the robbery was to be conducted.

**Arrest of Keith COUSIN and Rico PERRY**

22. On January 28, **COUSIN** initiated a phone call to the CW. I was present during the phone call and heard the conversation. **COUSIN** asked the CW where he was at the moment and advised that he was ready to meet with SA Valles later that day. **COUSIN** advised the CW that his "people" were ready, eluding to the robbery that was scheduled for that day. The CW advised that the CW was going to meet SA Valles and call **COUSIN** when they were ready to meet.

23. Later that morning, SA Valles initiated a phone call to **COUSIN** advising that they should meet in the parking lot of the Hilton Garden Inn, where they had met during previous controlled meetings. **COUSIN** advised that he was on the way and would meet at the hotel. Agents observed a blue Honda Accord with Massachusetts license plates 634AM1 park across the street from the hotel. A black male, matching the height and weight description of **COUSIN**, wearing a hood, exited the vehicle and began looking around the area. That individual, later identified as **COUSIN**, turned around and returned to the vehicle, and drove away from the area.

24. The blue Honda Accord with Massachusetts license plates 634AM1, is registered to Marvin Smith, with a registered address in Lynn, MA. Smith is known by Agents to be the step-father of **COUSIN**, and during a previous interaction on January 7, 2020, **COUSIN** was picked up at that address by the CW. **COUSIN** explained to the CW that he resides at that address.

25. Once **COUSIN** left the area in the vehicle, **COUSIN** called SA Valles and informed him that he saw what he thought was a police car in the area. **COUSIN** further explained that he did not want to meet in that parking lot anymore. SA Valles directed **COUSIN** to a storage facility where they could meet and talk further. **COUSIN** advised that he would meet SA Valles at the storage facility. **COUSIN** drove the blue Honda Accord to the storage facility and exited the

9

vehicle with **PERRY**.

26. **COUSIN** and **PERRY** advised SA Valles that they were prepared to conduct the robbery. **COUSIN** further explained that his "driver" was in the area and was ready and waiting. SA Valles asked **COUSIN** and **PERRY** if they had their guns. **COUSIN** advised that their firearms were in the vehicle with the "driver." SA Valles suggested that the "driver" also meet at the storage facility so everyone could be on the same page with the robbery plan.

27. **COUSIN** and **PERRY** returned to their vehicle, the blue Honda Accord, and exited the facility, explaining that they would go get the "driver." After exiting the storage facility **COUSIN** called and informed SA Valles that they would return in 10 minutes with the "driver." During that phone call Agents observed **COUSIN** driving the blue Honda Accord through a nearby Burger King parking lot.

28. Without notice, **COUSIN** and **PERRY** returned to the storage facility in the blue Honda Accord. Unlike the previous time, **COUSIN** and **PERRY** parked their vehicle on the back side of the storage unit and approached SA Valles on foot. SA Valles explained that he had rented a storage unit to use as a known place to meet up after the robbery. SA Valles also explained that he had rented another car that they could use for the robbery if they preferred. **COUSIN** told SA Valles that he was smart for providing the car and storage unit. **COUSIN** also asked SA Valles for some gas money because he didn't want to have anything on him, not even his wallet. SA Valles, **COUSIN**, and **PERRY** opened up the storage unit and entered inside. While inside of the storage unit **COUSIN** and **PERRY** overtly showed to SA Valles that they were not wearing any wires by removing some of their clothes. SA Valles was encouraged to do the same and removed some of his clothes to show he was also not wearing a wire.

29. **COUSIN** and **PERRY** explained that the "driver" was nearby. **COUSIN** and **PERRY** exited the inside of the storage unit and explained to SA Valles that they wanted to take the rental vehicle to pick up the "driver" and guns. At that point ATF Agents commenced an arrest of **COUSIN** and **PERRY** and both individuals were taken into custody.

**Criminal History of Keith COUSIN**

30. I have reviewed Keith **COUSIN's** criminal history, as maintained by the Massachusetts Board of Probation, which includes a 2010 conviction for Possession of a Firearm and Possession of Ammunition, a 2008 conviction for Assault and Battery with a Dangerous Weapon, a 2005 conviction for Possession of a Firearm, a 2003 conviction for Possession of a Firearm, a 2002 conviction for Armed Robbery and Assault with a Dangerous Weapon, a 2001 conviction for Breaking and Entering at Night with Intent to Commit a Felony and Larceny, and a 2001 conviction for Unarmed Robbery. The aforementioned convictions are for crimes punishable by a term of imprisonment exceeding one year in the Commonwealth of Massachusetts.

**Criminal History of Rico PERRY**

31. I have reviewed Rico **PERRY's** criminal history, as maintained by the Massachusetts Board of Probation, which includes a 2013 conviction for Intimidation, 2009 convictions for Armed Assault with Intent to Murder, two counts of Breaking and Entering with Intent to Commit a Felony, Larceny of a Motor Vehicle, and 2006 convictions for two counts of Assault and Battery. The aforementioned convictions are for crimes punishable by a term of imprisonment exceeding one year in the Commonwealth of Massachusetts.

**CONCLUSION**

32. Based on the foregoing, I submit that there is probable cause to believe that, on or about January 28, 2020, **KEITH COUSIN** and **RICO PERRY** conspired to commit robbery affecting interstate commerce in violation of Title 18, United States Code, Section 1951. I submit that there further is probable cause to believe that **KEITH COUSIN** and **RICO PERRY** conspired to possess with the intent to distribute in excess of five (5) kilograms of a mixture or substance containing cocaine, a Schedule II narcotic controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 846.

ROBERT JACOBSEN
SPECIAL AGENT, ATF

Sworn and subscribed to before me this 28th day of January, 2020.

HON. MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS